RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0391p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

JERMAINE SUTTON,

        *Plaintiff-Appellee*,

    *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE
AND DAVIDSON COUNTY, et al.

        *Defendants*,

RICHARD MARTIN, in his individual and
official capacities as a Metro Police Officer,

        *Defendant-Appellant.*

No. 11-6449

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cv-400—Kevin H. Sharp, District Judge.

Decided and Filed: November 28, 2012

Before: GILMAN, GIBBONS, and ROGERS, Circuit Judges.

—————————————

## COUNSEL

—————————————

**ON BRIEF:** Keli J. Oliver, Derrick C. Smith, DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,
Nashville, Tennessee, for Appellant. Andrew N. Egan, Hermitage, Tennessee, Mary
Leech, Nashville, Tennessee, for Appellee.

—————————————

## OPINION

—————————————

RONALD LEE GILMAN, Circuit Judge. Jermaine Sutton was detained and
arrested on a misdemeanor theft charge after Officer Richard Martin was called to a
Kroger grocery store following an alleged shoplifting. Officer Martin took possession
of a cell phone allegedly dropped by the perpetrator. Based on a conversation with a

1

person listed in the phone's "contacts" list, he went to Summit Medical Center where Sutton worked. The confrontation between the two resulted in Sutton's arrest for shoplifting.

A jury acquitted Sutton at trial. Sutton subsequently sued Officer Martin and the Nashville and Davidson County Metropolitan Government for a host of federal constitutional violations and state common law and statutory violations. Officer Martin filed a motion to dismiss the complaint for failure to state a claim. The district court dismissed Sutton's claims based on the Fifth and Fourteenth Amendments but denied the motion as to Sutton's Fourth Amendment claim regarding an unreasonable seizure, finding that he had adequately stated a cause of action and that Officer Martin was not entitled to qualified immunity. Officer Martin has timely filed an interlocutory appeal.

This case turns on whether Officer Martin had reasonable suspicion to detain Sutton or probable cause to arrest him. For the reasons set forth below, we **AFFIRM** the district court's order denying Officer Martin's motion to dismiss, but we do so by considerably narrowing the scope of Sutton's Fourth Amendment claim.

## I. BACKGROUND

### A.     Factual background

All of the following facts are based solely on the allegations in Sutton's complaint. No discovery has yet taken place and no affidavits or other documents have been filed.

On April 21, 2009, Officer Martin responded to a reported shoplifting at a Kroger grocery store. He ended up in possession of a cell phone that was found in the pocket of a jacket dropped by the alleged perpetrator. Officer Martin then called a number saved in the cell phone's contacts list. The person who answered the call told him that she knew a person named Jermaine Sutton who worked at "Summit Hospital." What else she may have told Officer Martin to connect Sutton to the shoplifting incident is not set forth in the complaint. In any event, Officer Martin left the Kroger store and went to Summit Medical Center to find Sutton.

Sutton was working in the kitchen at Summit Medical Center when he was told by a co-worker that someone was in the cafeteria wanting to see him. He went to the cafeteria, where he was quickly surrounded by Officer Martin and three other police officers. Officer Martin pulled out a cell phone from a bag and asked Sutton if it was his phone. Sutton said that it was not. When Officer Martin then asked Sutton where his cell phone was, Sutton showed Officer Martin a different cell phone taken from Sutton's own pocket, which Officer Martin promptly confiscated over Sutton's protest. This prompted Officer Martin to say that Sutton "looked like the kind of man who would have a couple nurses on the side and . . . would need two cell phones to talk to them so that [Sutton's] wife would not find out about them."

After Officer Martin confiscated the cell phone that Sutton had produced from his pocket, Sutton told Officer Martin that he needed the phone to call his wife, and he asked if he could "clock out" from his job. Officer Martin responded that Sutton "could not go anywhere or do anything." He then explained that someone had stolen meat from a Kroger store, that the police had "found the telephone in [Sutton's] jacket after [he] took off running," and that if Sutton told the truth, Officer Martin could "just write [Sutton] a citation." Sutton denied stealing anything.

Despite Sutton's denial of having any connection to the cell phone or to the alleged shoplifting, Officer Martin took Sutton tightly by the arm and, along with the other officers, escorted him out of the hospital. A Kroger security guard from the grocery store in question, John Szcerbiak, who was waiting nearby in his car, identified Sutton as the perpetrator. Officer Martin then told Sutton that he was under arrest, handcuffed him, gave him the *Miranda* warnings, put him in the back seat of a police car, and drove to the scene of the theft. Sutton remained in the car for 45 minutes while Officer Martin went inside the Kroger store to view a security video of the shoplifting. Officer Martin returned to the car, said that he was unsure whether Sutton was the person depicted in the video, and went back to look at the video again. Despite his own uncertainty, Officer Martin took Sutton "downtown" at Szcerbiak's urging, where the

latter swore out a warrant charging Sutton with misdemeanor theft. Sutton was held in jail for several hours until his wife posted bond.

**B.     Procedural background**

After Sutton was tried and acquitted in June 2009, he pursued federal and state claims against Officer Martin, the Metropolitan Government, Szcerbiak, and Kroger. The district court sustained Officer Martin's motion to dismiss most of the claims but denied the motion as to Sutton's claim of an unreasonable seizure under the Fourth Amendment.

Officer Martin argued that reasonable suspicion supported his initial detention of Sutton at the hospital and that Szcerbiak's identification of Sutton provided probable cause for the latter's subsequent arrest. He thus contended that Sutton failed to state a claim under the standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). And even if Sutton had stated a claim, Officer Martin argued that he is entitled to qualified immunity.

The district court rejected both arguments. Because the first step in a qualified-immunity analysis is to determine whether the officer's alleged conduct violated a constitutional right, the court analyzed Officer Martin's *Twombly* argument within the qualified-immunity framework. It found that the facts did not support Officer Martin's position that he had reasonable suspicion to detain Sutton because the informant (the person in the perpetrator's cell-phone contacts list) was not necessarily "reliable both in [her] assertion of illegality and in [her] tendency to identify a determinate person." The court also noted that it could not tell from the record "whether the degree of intrusion was warranted" or how long the hospital encounter lasted.

A similar "lack of facts" defeated Officer Martin's argument on probable cause. The court held that Szcerbiak's identification "[did] not necessarily establish probable cause" because the court could not yet determine whether there might have been an apparent reason for Officer Martin to disbelieve Szcerbiak.

Having found that Sutton adequately stated a Fourth Amendment claim, the district court turned to the second step of the qualified-immunity analysis and concluded that detaining a person for an investigatory stop without reasonable suspicion and arresting a person without probable cause violated clearly established Fourth Amendment law. The court therefore denied Officer Martin's motion on the Fourth Amendment claim. This interlocutory appeal followed.

## II. ANALYSIS

### A.       Standard of review

A district court's denial of a motion to dismiss that raises a qualified-immunity defense is reviewed de novo. *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001). But the rejection of a qualified-immunity claim is reviewable on interlocutory appeal only to the extent that it raises a question of law and does not concern a factual dispute. *Floyd v. City of Detroit*, 518 F.3d 398, 404 (6th Cir. 2008); *see also Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that a district court's denial of qualified immunity is a "final decision" under 28 U.S.C. § 1291 "to the extent that it turns on an issue of law"). We will therefore limit our review to the purely legal question of whether the facts as alleged by Sutton would allow a jury to find a violation of a clearly established constitutional right. *See Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005).

To survive a motion to dismiss for failure to state a claim, a complaint must allege sufficient facts that, accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff at this stage of the case is entitled to have the complaint construed in the light most favorable to him. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

When a government official is sued in a § 1983 action, the official may raise the defense of qualified immunity. Once raised, the burden is on the plaintiff to demonstrate that the qualified-immunity defense is unwarranted. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2011). The facts as alleged must show that the defendant violated a constitutional right and that the right was clearly established, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), but the analysis need not proceed in that order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (allowing courts the discretion to decide which of the two steps in the qualified-immunity analysis should be addressed first). A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

## B.     Sutton has stated a § 1983 claim for violation of his Fourth Amendment rights

The Fourth Amendment guarantees that "government officials may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). A police officer having probable cause to believe that a criminal offense has been committed may make a warrantless arrest without offending the Fourth Amendment. *Id.* (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). On the other hand, a short investigatory detention, rather than an arrest, requires only "reasonable suspicion of criminal activity." *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). We will first address Sutton's argument that he was detained without reasonable suspicion and then turn to the claim that he was arrested without probable cause.

### 1.     *The lack of reasonable suspicion to detain Sutton beyond the cell-phone inquiry*

Officer Martin acknowledges that his initial encounter with Sutton at Summit Medical Center was an investigatory detention. To justify this detention, Officer Martin "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *See Terry*, 392 U.S. at 21. The complaint alleges that Officer Martin knew the following facts at the

time he initiated the detention: (1) a theft was reported at a Kroger grocery store, (2) an abandoned cell phone was found at the store, (3) Officer Martin called a number in the cell phone's contacts list, and (4) the person Officer Martin called said that she knew a person named Jermaine Sutton who worked at Summit Hospital, but did not say that the cell phone belonged to Sutton.

Sutton argues, consistent with the district court's opinion, that the information provided by the person Officer Martin called on the cell phone was insufficient to provide reasonable suspicion for detaining Sutton because the information was not reliable. Both he and the district court cite *Florida v. J.L.*, 529 U.S. 266 (2000), for the proposition that the "tip" Officer Martin received was not "reliable in its assertion of illegality." The informant made no connection between Sutton and the theft, Sutton argues, and provided no predictive information by which Officer Martin could assess her knowledge or credibility. Sutton concludes that because the informant's tip was unreliable, Officer Martin lacked reasonable suspicion to detain Sutton for questioning.

The reliance by Sutton and the district court on *J.L.* is misplaced. Unlike *J.L.*, the present case does not involve an anonymous informant contacting the police to report illegal activity. *See J.L.*, 529 U.S. at 268 ("[A]n anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."). The Supreme Court noted in *J.L.* that, for the anonymous-informant situation it was reviewing, reasonable suspicion "requires that a tip be reliable in its assertion of illegality." *Id.* at 272.

In the present case, Officer Martin called a number saved in the cell phone solely to ascertain who left the cell phone at the Kroger store. He did not call that person for information about the actual theft. Unlike the knowledge possessed by the informant in *J.L.*, the person that Officer Martin called did not need to know anything about the shoplifting in order to provide Officer Martin with reasonable suspicion because the cell phone was already tied to the shoplifting. That the person Officer Martin called did not witness the shoplifting is thus irrelevant.

Sutton also argues that because the person Officer Martin called did not state that the cell phone belonged to him, she provided Officer Martin no connection whatsoever between Sutton and the theft. This argument contains both a factual allegation from the complaint and an inference drawn from that allegation. The complaint alleges that "the person from the contacts list . . . never stated the found phone was Jermaine Sutton's phone." Because we are reviewing the denial of Officer Martin's motion to dismiss, we must accept this allegation as true. *See, e.g.*, *Michigan Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 865 (6th Cir. 2000) (accepting factual allegations in the complaint as true on review of a denial of a motion to dismiss). But the second part of Sutton's argument—that the person Officer Martin called provided no connection whatsoever between Sutton and the theft—is not alleged in the complaint. Rather, it is an inference that Sutton draws from the fact that "the person from the contacts list" did not state that the phone found at the Kroger store belonged to Sutton.

Sutton's proposed inference implicates three key facts from the complaint: (1) the person called by Officer Martin gave Sutton's name and place of work to Officer Martin, (2) she did not say that the cell phone belonged to Sutton, and (3) Officer Martin then went to Summit Medical Center to question Sutton about the cell phone. Two opposing inferences can be drawn from these facts: (1) the inference that the person called by Officer Martin provided no connection whatsoever between Sutton and the cell phone, or (2) the inference that the person called by Officer Martin gave him further information that connected Sutton to the cell phone (without saying that Sutton owned it), thus motivating Officer Martin to find and question Sutton on that topic. If the first inference is warranted by the alleged facts, then our obligation to "construe the complaint in the light most favorable to [Sutton]" requires us to accept his inference. *See Bennet v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But if the alleged facts do not warrant Sutton's inference, then we need not accept it as true. *See, e.g.*, *id.* ("We need not, however, accept unwarranted factual inferences.").

Sutton's inference is unwarranted because it makes no logical sense. Neither the complaint nor Sutton's brief suggest why, other than by reason of a connection to the cell phone, the person contacted by Officer Martin would have given Sutton's name to Officer Martin. Nor do these documents suggest why, absent such a connection, Officer Martin would seek out Sutton to ask whether the cell phone belonged to him. Thus, the only reasonable inference that we can draw is that the person contacted by Officer Martin made some connection between the cell phone and Sutton that is not set forth in the complaint, providing Officer Martin with reasonable suspicion to further investigate that connection. Sutton has therefore failed to sustain his burden of stating a claim that Officer Martin violated his Fourth Amendment rights during the initial contact and questioning.

Assuming that Officer Martin had a proper basis for the initial investigatory detention, we must next determine "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of [Officer Martin's] conduct given [his] suspicions and the surrounding circumstances." *United States v. Beauchamp*, 659 F.3d 560, 569 (6th Cir. 2011) (ellipsis and internal quotation marks omitted). "The scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). "When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *Id.* An officer can ask a moderate number of questions to ascertain the detainee's identity and to confirm or dispel that officer's initial suspicions, but "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id.* (internal quotation marks omitted).

The permissible scope of Officer Martin's initial detention of Sutton was to ascertain his identity and to ask limited questions regarding the cell phone found at the Kroger store. These are "the circumstances that initially justified the stop." *See id.* Officer Martin did just that—he pulled out the cell phone found at the Kroger store and

asked Sutton if it belonged to him. Sutton denied ownership of that cell phone and, when asked, produced one from his own pocket. At this point, a reasonable person in Sutton's position would not have felt under arrest because he had been questioned only briefly and remained at the scene of the initial detention. *See, e.g.*, *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991) ("The test is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way.") (internal quotation marks omitted). Because the restraint on Sutton's freedom at that point was quite limited, the *Terry* stop had not converted into an arrest. *See id.* Had Sutton's detention ended here, his Fourth Amendment rights would not have been violated. But it did not so end.

Instead, Officer Martin discounted the exculpatory information that Sutton provided by wildly speculating that Sutton "looked like the kind of man who would have a couple of nurses on the side and . . . would need two cell phones . . . so that [his] wife would not find out about them." An officer, however, cannot use pure speculation to "turn a blind eye toward potentially exculpatory evidence" when assessing cause for the continued detention of a suspect. *Skovgard v. Pedro*, 448 F. App'x 538, 544 (6th Cir. 2011) (internal quotation marks omitted). Having received an answer to his cell-phone inquiry that did not produce more suspicion and knowing no other facts that could justify the investigatory detention, Officer Martin lacked a reasonable basis for detaining Sutton any further. The facts as alleged thus allow us to draw the reasonable inference that Officer Martin was at that point detaining Sutton without reasonable suspicion, in violation of the latter's Fourth Amendment rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (defining "facial plausibility" as "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### 2. *Sutton's continued detention amounted to an arrest before the eyewitness identification*

Officer Martin also argues that he had probable cause to arrest Sutton based on the eyewitness identification provided by Szcerbiak, the Kroger security guard. An eyewitness identification is generally sufficient to establish probable cause for an arrest, unless "there is an apparent reason for the officer to believe that the eyewitness was lying" or was otherwise mistaken. *United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011) (internal quotation marks omitted). The district court wrongly discounted Szcerbiak's identification by reasoning that the court was "not in a position to determine whether there was some 'apparent reason' for Officer Martin to disbelieve Mr. Szcerbiak." But this reasoning fails to take into account that Sutton has the burden of alleging facts that, accepted as true, state a plausible claim for relief. *See Twombly*, 550 U.S. at 570. The complaint does not allege that Officer Martin had reason to doubt Szcerbiak's identification of Sutton.

Even though Officer Martin later viewed the Kroger surveillance video and was unsure whether Sutton was the person depicted therein, he had no reason at the time of Szcerbiak's identification of Sutton at Summit Medical Center to doubt its accuracy. And even if Officer Martin had viewed the surveillance video earlier, his uncertainty about whom the video depicted would not have obligated him to override Szcerbiack's positive identification. Szcerbiack, after all, was the one who swore out the warrant charging Sutton with the theft, not Officer Martin. In sum, Sutton's arrest following Szcerbiak's identification does not state a Fourth Amendment claim.

But this error by the district court does not warrant a reversal because Sutton's detention amounted to an arrest prior to Szcerbiak's identification. The detention went beyond questioning Sutton about the cell phone and had several characteristics of a "show of official authority" that the Supreme Court has found tantamount to an arrest. *See Florida v. Royer*, 460 U.S. 491, 501-04 (1983) (plurality opinion) (describing circumstances showing that the defendant was seized beyond a *Terry* stop). In *Royer*, the Court concluded that the defendant was under arrest when the officers confronting

him identified themselves as narcotics agents, told him that they suspected him of transporting narcotics, and asked him to accompany them to a separate room in the airport without indicating that he was free to leave. *Id.* at 501. The officers had also seized the defendant's luggage. *Id.* at 503. Similarly, Sutton was surrounded by four officers, told that he was a suspect, had his property confiscated, and then was grasped by the arm and escorted away from his place of work. Not only did Officer Martin not "indicat[e] in any way that [Sutton] was free to depart," *see id.* at 501, but he affirmatively stated that Sutton "could not go anywhere or do anything."

To be sure, the officers did not place Sutton in a police vehicle or read him the *Miranda* warnings before Szcerbiak identified him, but these factors are not necessary to a determination that a detainee was arrested. *See Lopez-Medina*, 461 F.3d at 740 (noting that reading *Miranda* rights is not dispositive). This court in *Lopez-Medina* highlighted removals to police stations or vehicles as particular situations that can transform a *Terry* stop into a full-fledged arrest, but did not hold that they were the only examples of detainee transfers that can, along with other factors, amount to an arrest.

"[T]he removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994). This is not to say, however, that any movement of a suspect is tantamount to an arrest. *See United States v. Johnson*, 246 F. App'x 982, 989 (6th Cir. 2007) (Cole, J., concurring) ("The Supreme Court has recognized that, in some circumstances, police may transport a suspect a short distance in aid of a *Terry* stop."). In *Johnson*, police officers transported a suspect to a nearby scene of a hit-and-run accident after finding the suspect walking in the vicinity of a damaged, abandoned vehicle and displaying signs of intoxication and disorientation. The suspect, Johnson, had head lacerations that were consistent with the police officers' observations that the vehicle's windshield had been struck by its driver's head. In holding that "[t]he specific, articulable facts indicated that Johnson had committed at least one" of a number of crimes related to the accident, the court concluded that moving him two-tenths of a mile back to the accident scene to further investigate whether he was

involved in the hit-and-run accident was justified under *Terry*. *Id.* at 986; *see also id.* at 990 (Cole, J., concurring) (further explaining the court's rationale).

The *Terry* stop in *Johnson* allowed for a brief transport of the suspect without escalating into an arrest because the police officers had a number of facts to sustain their reasonable suspicion. A broader factual base of suspicion permits a broader scope of detention because, as noted above, "[t]he scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). No bright-line rule defines the length or scope of a *Terry* stop or when such a stop becomes an arrest. *Houston v. Clark Cnty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 823 (6th Cir. 1999) (*citing United States v. Sharpe*, 470 U.S. 675, 685-86 (1985)). The fact that a suspect may be transported in one *Terry* stop, in other words, does not mean that police officers can forcibly move suspects in all *Terry* stops.

Unlike the officers in *Johnson*, Officer Martin's sole basis for suspecting that Sutton was the shoplifting perpetrator was an alleged connection to the cell phone found at the Kroger grocery store, and this basis was neutralized when Sutton produced a cell phone from his own pocket. Given the other *Royer*-like indicia of arrest discussed above, Sutton's forcible removal from the hospital exceeded the bounds of a *Terry* stop and was thus an arrest requiring probable cause. Officer Martin does not contend that he had probable cause to arrest Sutton absent Szcerbiak's identification. Sutton has therefore adequately pleaded that he was arrested without probable cause when he was removed from the hospital.

**C.      Officer Martin is not entitled to qualified immunity**

To defeat Officer Martin's claim of qualified immunity, Sutton must show not only that Officer Martin violated one of Sutton's constitutional rights, but that the right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). For the reasons set forth in Part II.B. above, Sutton has stated a Fourth Amendment claim, thus satisfying the first step in the qualified-immunity analysis. The next step is to determine

whether the Fourth Amendment right violated was clearly established at the time of Officer Martin's alleged misconduct.

A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2011) (internal quotation marks omitted). The source of law that clearly establishes such a right is "precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (internal quotation marks omitted). A court need not have previously held illegal the conduct in the precise situation at issue because "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir. 2005) (internal quotation marks omitted).

The district court summarily concluded that the law clearly established that an arrest without probable cause and a *Terry* stop without reasonable suspicion violate the Fourth Amendment. But the court's bare-bones analysis is far too general, failing to recognize that the right violated must be clear in a particularized context so that a reasonable official would be on notice that his actions were unconstitutional. *See Saucier*, 533 U.S. at 202. Still, taking the facts alleged in the complaint as true, Sutton's constitutional rights were clearly established in this context and the court properly concluded that the qualified-immunity defense fails at this juncture.

Officer Martin argues that no clearly established law "would have put [him] on notice that questioning a person who had been identified in some connection to a telephone dropped at the scene of a crime would amount to an unlawful 'Terry stop.'" This argument, however, misunderstands the nature of the constitutional violation as alleged by Sutton. Officer Martin's initial detention of Sutton for questioning was permissible because the only reasonable inference that the complaint supports is that the information from the person contacted on the cell phone provided an adequate basis for suspecting that Sutton was connected to the theft. But Officer Martin's continued detention of Sutton became unreasonable after Officer Martin asked about the cell phone

and saw that Sutton had his own.  Sutton's production of his own cell phone, in other words, neutralized whatever reasonable suspicion that had previously existed.

At the time of Officer Martin's encounter with Sutton, Supreme Court precedent was clear that *"Terry* detentions must be 'limited in both scope and duration.'" *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (brackets omitted) (quoting *Royer*, 460 U.S. at 500).  The law was clearly established  in "unequivocal" terms that reasonable suspicion justifies only a "temporary seizure for the purpose of questioning limited to the purpose of the stop." *Royer*, 460 U.S. at 498 (citing  *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)); *but cf. Muehler v. Mena*, 544 U.S. 93, 101 (2005) (questioning a detainee about her immigration status, unrelated to the purpose of the detention, was permissible when the questioning did not prolong the detention); *Everett*, 601 F.3d at 490 (explaining that the off-topic questioning in *Mena* did not violate the Fourth Amendment because it did not prolong the detention).

Officer Martin's only basis for detaining Sutton was his possible connection to the cell phone found at the Kroger store.  Although the Kroger store had a security video of the shoplifting, Officer Martin had not viewed it before detaining Sutton, which precludes the video from being a supplemental source for reasonable suspicion or probable cause.  Officer Martin's continuing detention of Sutton thus violated the law clearly established in *Terry*, *Brignoni-Ponce*, *Royer*, and *Obasa*, among other cases.

Likewise, the law was clearly established that the circumstances of Sutton's continued detention amounted to an arrest.  The circumstances here track those present in *Royer*:  law-enforcement officers confronted Royer, identified themselves, told him that he was suspected of a crime, asked him to accompany them to a separate room without indicating that he was free to leave, and seized his property.  460 U.S. at 494.  Sixth Circuit precedent has highlighted the *Royer* factors in describing seizures that are tantamount to a formal arrest.  *See, e.g.*, *United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010)  ("[T]he Supreme Court [in *Royer*] cited a criminal accusation by law enforcement as a factor indicating that an individual was seized."); *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991) (listing the *Royer* factors).

Although *Royer* occurred in the context of an airport detention, this court has applied its analysis generally. *See, e.g.*, *Richardson*, 949 F.2d at 854-57 (applying the *Royer* factors when officers approached the defendant at a storage facility). In the present case, Officer Martin accused Sutton of a crime, confiscated his cell phone, told him that he "could not go anywhere or do anything," grabbed him by the arm, and escorted him from the hospital. Officer Martin's affirmative command that Sutton could not leave was in fact a clearer intrusion on Sutton's liberty than the passive conduct that the *Royer* court found significant—the failure to indicate that Royer was free to leave. 460 U.S. at 501.

In sum, Officer Martin is protected by qualified immunity with regard to his initial contact with Sutton and in continuing to detain Sutton after the latter was positively identified by Szcerbiak. But the allegations of Officer Martin's conduct between those two events are sufficient to state a claim that precludes qualified immunity at this stage in the litigation.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's order denying Officer Martin's motion to dismiss, but we do so by considerably narrowing the scope of Sutton's Fourth Amendment claim.